# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**TROY ALLEN BERG**,

        Petitioner,

v.

**MANDI MARIE WONDRA**,

        Respondent.

Case No. 3:25-cv-01914-SI

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Troy Allen Berg, 411 Walnut St. #19108, Green Cove Springs, FL 32043, Petitioner *pro se*.

Michael B. Fitzsimmons, JAQUES SHARP, 205 Third Street, Hood River, OR 97031. Of Attorneys for Respondent.

**Michael H. Simon, District Judge.**

        Troy Allen Berg ("Mr. Berg") filed a Verified Petition for Return of Child to Habitual Residence ("Petition for Return") under the 1980 Convention on the Civil Aspects of International Child Abduction ("Convention"). Mr. Berg requested the return of his 15-year-old daughter ("MSB"), asserting that MSB's mother, Mandi Marie Wondra ("Ms. Wondra"), violated Mr. Berg's parental and custodial rights under the Convention by removing MSB from Mexico to the United States in March 2025, and retaining her in the United States thereafter.

The Convention mandates that a child wrongfully removed from her country of "habitual residence" must be returned to that country. Mr. Berg argues that MSB's country of habitual residence is Mexico and that the Court must order her return. Ms. Wondra responds that the United States, not Mexico, is MSB's country of habitual residence. Additionally, Ms. Wondra argues that 15-year-old MSB is subject to the Convention's "mature child" exception and that MSB's preference to remain in the United States should be given great weight.

The Court held a trial on December 8, 2025, at which both parties testified, presented exhibits, and provided testimony of other witnesses.[1] The Court also conducted *in camera* judicial interviews of both MSB and her older brother, TSB, who is 17 years old. After considering the evidence and arguments presented by the parties, including the judicial interviews of MSB and TSB, the Court DENIES Mr. Berg's Petition for Return. The evidence shows both that Mexico is not MSB's habitual residence and that, as a mature child, MSB's objections to returning to Mexico should be given great weight, were not unduly influenced, and are well taken.

## FINDINGS OF FACT

The Court makes these findings of fact by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1). Although the Court received all exhibits that were offered, the Court will consider only admissible evidence and has discounted evidence of only marginal or dubious weight.

### A.  MSB's Childhood in Wisconsin and During World Travels

Mr. Berg and Ms. Wondra are both citizens of the United States. Neither are citizens of Mexico. They have two children: a son, TSB, born in 2008, and a daughter, MSB, born in 2010.

---

[1] Mr. Berg called as witnesses himself and Ms. María Alba Pérez Briceño, an expert in Mexican family law. Ms. Wondra called as witnesses herself and Mr. Pieter Hartog, a friend and former neighbor in Mexico.

Ex. 205 at 1 ¶ 4. Ms. Wondra earns her living as a consultant. Trial Tr. 65:18-20. Mr. Berg was at one time a software developer and is now "transitioning into rental properties." *Id.* at 32:24-33:5. Before January 2019, the Mr. Berg, Ms. Wondra, TSB, and MSB lived together in La Crosse, Wisconsin. MSB attended virtual public school in Wisconsin and had friends there. Ex. 205 at 4; Trial Tr. 161:18-19; 173:8-14. She also attended religious services in Wisconsin. Trial Tr. 76:17-21.

In January 2019, Mr. Berg and Ms. Wondra removed TSB and MSB from the La Crosse public school system, and Ms. Wondra began to homeschool the children so that the family could travel full time. Ex. 205 at 4; Trial Tr. 66:15-24. From January 2019 to April 2024, the family frequently took international trips that lasted from a few weeks to several months. Ex. 205 at 4-5. The family's most frequent travel spots were Hood River, Oregon and La Ventana, Mexico. Throughout this time, the family retained their house in La Crosse as their "home base." Trial Tr. 71:2-7. Their extended family was there. *Id.* 71:7-8; Ex. 102 ¶ 4. Their belongings were there. *See* Trial Tr. 71:6-7. MSB received most of her medical care in Wisconsin, except for "a few dental cleanings," which took place in Mexico. *Id.* 17-19; Ex. 102 ¶ 4.

From MSB's birth through April 2024, the family considered La Crosse, Wisconsin to be their home and habitual residence. Ms. Wondra had a Wisconsin driver's license, voted in Wisconsin, and paid state income taxes in Wisconsin as a full-time resident. Trial Tr. 111:5-112:9. Although it is unknown where Mr. Berg pays income taxes, votes, or has a driver's license, in connection with Wisconsin state custody proceedings, Mr. Berg filed a declaration on June 5, 2025, stating that "[he] continues [to] reside in La Crosse County, Wisconsin, and had planned to keep [MSB] enrolled in the La Crose [*sic*] School District." Ex. 101 at 5 ¶ 15. In separate custody proceedings in Oregon, Mr. Berg similarly filed a declaration on September 2,

2025, stating that he "continue[s] to reside in La Crosse County, Wisconsin, and had planned to keep [MSB] enrolled in the La Crosse School District." Ex. 102 ¶ 13. On November 8, 2022, Mr. Berg opened a Mexican bank account but listed his home in La Crosse as his home address. Trial Tr. 120:14-18; 125:17-126:10; Ex. 226 at 1-2.

### 1. The Berg/Wondra Family's Trips to La Ventana

La Ventana became a regular vacation spot for the family, who enjoyed wind sports like kite surfing and wind foiling. *See* Trial Tr. 48:5-9; 73:6-8; 172:6-22. While there, they rented a lot at a beachfront campground that held about 100 to 150 campsites. *Id.* at 25:3-26:10; 48:2-10. During their first trip, from February to May 2021, the family slept in a van. *Id.* at 69:14-70:5. Upon returning in the fall of 2022, they purchased a recreational vehicle ("RV"), listing their home in La Crosse, Wisconsin as their home address on the bill of sale. *Id.* at 25:3-26:4; 72:8-14; Exs. 105, 220. The campsite in La Ventana does not have running water or plumbing hookups, but the family accessed water by carrying it in from town, having it delivered, or using a "water maker and filtration system" in the RV. Trial Tr. 86:21-87:22. The RV's septic tanks have to be pumped out from time to time, or the family can use the campground's onsite restrooms. *Id.* at 27:5-28:2; 72:15-73:19. Additionally, the camp does not have electrical hookups, and the family depends on solar power. *Id.* at 26:22-25; 72:15-73:10. With few exceptions, there are no permanent structures at the campground. *Id.* at 48:21-49:4. One neighbor has a concrete slab and some poles at his site. *See id.* at 62:20-63:4.

Most campers at La Ventana are from the United States or Canada. *Id.* at 48:2-10; 72:15-21. There are few if any Mexican nationals, and only a few have Mexican residency. *Id.* at 49:5-12; 73:24-25; 87:23-88:20. Despite Spanish being the primary language in Mexico, a knowledge of Spanish generally is not needed to communicate at the campsite. *Id.* at 49:16-22. The other campers, like the Berg/Wondra family, come only for a few months during the winter, mostly to

enjoy La Ventana's wind sport conditions. *Id.* at 48:5-18; 72:15-73:8. Indeed, there is a group of wind sport enthusiasts from Hood River, where MSB now lives, who spend their winters in La Ventana. *Id.* at 76:8-14; 77:11-25.

In La Ventana, MSB made friends with other children her age, including Mr. Pieter Hartog's daughter, although her friends generally remained in Mexico for only a few months at a time, just like she did. Trial Tr. 47:19-23; 77:11-25; 178:24-179:5.[2] MSB participated in wind sport competitions, which she enjoyed and at which she excelled. *Id.* at 8:20-9:2; 55:16-20. She did not attend religious services in La Ventana or become involved in the more established Mexican community outside the campground. *Id.* at 76:15-16. She was able to continue her schooling virtually through her home school district in Wisconsin and never took any classes at a Mexican school. *Id.* at 74:1-5. She did not have a job in La Ventana. Significantly, MSB viewed her time in La Ventana as a vacation, a sentiment that she shares with her mother, brother (TSB), and family friend Mr. Hartog. *Id.* at 172:6-14; 49:13-15; 121:2-8; 162:12-163:4.

Throughout their time in La Ventana, Mr. Berg and Ms. Wondra did not make any improvements to their campsite, as did one of their neighbors, to make it more suitable for permanent habitation. Although Mr. Berg and Ms. Wondra once looked at possibly buying a house in La Ventana, they never purchased a home or land there. *Id.* at 102:19-21. On one occasion, Mr. Berg went by himself to look at some undeveloped land. *Id.* at 102:22-24.

---

[2] At trial, Mr. Berg described TSB's friendships with a Mexican national named "Robby," who was a "25 to 30" year-old professional kite-boarder who coached TSB, and with a Mexican boy named "Santi." Trial Tr. 89:7-91:3. Ms. Wondra did not agree with characterizing Robby, a grown man, as friends with her son (TSB), who is a minor *at least* eight years younger than Robby. Ms. Wondra did not know Santi but acknowledged that TSB was friendly with some of the Mexican children who came on occasion to compete in wind sport events. *Id.* at 90:11-18. Those children, she recalled, generally left La Ventana after the competitions. *Id.* Importantly, Mr. Berg did not characterize Robby or Santi as friends with MSB, the child at issue in this case.

**B.  Mr. Berg and Ms. Wondra's Split and the Parenting Agreement**

In February or March of 2024, while in La Ventana, Ms. Wondra discovered information that led her to believe that Mr. Berg was having an affair. *Id.* at 79:22-23; 94:12-22. This resulted in a fight that escalated to yelling and during which Ms. Wondra struck Mr. Berg. *Id.* at 79:23-25; 95:16-96:14. After the fight, Ms. Wondra ended her relationship with Mr. Berg. *Id.* at 80:1; 96:13-20.

On April 5, 2024, Ms. Wondra sold the family's home in La Crosse, WI, and in May 2024 moved to a home in Hood River, OR. Ex. 205 at 5. MSB and her brother (TSB) resided full time in Hood River from May until November 2, 2024. *Id.* They enrolled at the Hood River Options Academy, a school that is primarily virtual except for proctored examinations and that offers some extracurricular activities including school trips. Trial Tr. 66:9-14; 177:20-178:8. MSB described having made lots of connections and friends in Hood River since May 2024. *Id.* at 173:12-14.

Mr. Berg and Ms. Wondra drafted a co-parenting agreement for the care of both children. *Id.* at 10:15-18; Ex. 202. The agreement contemplates the children splitting time between Hood River and La Ventana—April through September in Oregon, and October through March in Mexico—with the children having the option to fly back and forth between locations to visit each parent regardless of the time of year. Ex. 202 ¶¶ 3, 9-10. The agreement further includes a provision placing the children in the "full custody" of one parent if the other parent engages in "excessive drinking or partying, drug use, mental illness, physical abuse, or mental abuse." *Id.* ¶ 15. At trial, Mr. Berg argued that the plan, although not thorough, was agreed upon by both he and Ms. Wondra. Trial Tr. 9:9-17. Ms. Wondra also testified that she agreed to the plan. *Id.* at 78:8-13. The plan was never filed in court and, by its own terms, was subject to change. Ex. 202 ¶ 14.

### C.  The Winter of 2024-25

In November 2024, MSB and TSB flew to La Ventana for their winter vacation with their father, but this time without their mother. Almost immediately, the children noticed a change in Mr. Berg's demeanor and described challenges in figuring out how to "re-fit in with him." Trial Tr. 147:23-148:19. TSB described Mr. Berg as being angry, frustrated, disapproving, "very, very strict," and "fed up with me." *Id.* at 148:20-149:5, 153:14. TSB also described one instance when Mr. Berg was "extremely depressed" and isolated himself in his bedroom for about a week. *Id.* at 159:4-15.

In contextualizing Mr. Berg's conduct during the winter of 2024-25, MSB and TSB both described events from previous winters when Mr. Berg got into physical fights with others, including a fight on the beach with several La Ventana locals that Ms. Wondra had to break up. *Id.* at 156:7-19, 170:11-14. On that occasion, Mr. Berg had been drinking. *Id.* at 156:20-22. Ms. Wondra and TSB independently described an incident several years before 2024-25, when, during an argument while driving in Mexico, Mr. Berg grabbed TSB by the neck in the presence of MSB. *Id.* at 80:24-81:8, 150:18-151:15, 154:6-10. TSB also described a second incident during which Mr. Berg again wrapped his hands around TSB's neck. *Id.* at 151:24-154:5.

Although Mr. Berg did not become physically violent with the children between November 2024 and February 2025, the combustible behavior continued, and MSB stated that Mr. Berg had "a very aggressive personality." *Id.* at 170:6-9. In addition, TSB stated that Mr. Berg drank daily. *Id.* at 156:20-22. One day that winter, while drunk, Mr. Berg told TSB that one day the two of them (Mr. Berg and his son TSB) were "going to fight." *Id.* at 156:24-157:1. During the 2024-2025 winter, Mr. Berg continued to have frequent conflicts with his children, particularly TSB. *See, e.g.*, *id.* at 150:1-6, 160:12-20.

By Christmas 2024, some of the neighbors at the campground had noticed Mr. Berg's behavior. Mr. Hartog testified that he was left with the impression that Mr. Berg had worked to keep Ms. Wondra out of the campground during her holiday visit, an impression that negatively changed his opinion of Mr. Berg. *Id.* at 50:15-52:10. Ms. Wondra corroborated Mr. Hartog's testimony, stating that she stayed in an Airbnb off the campground premises for the holiday, and that when the children verbalized that they wanted to spend Christmas Eve at the Airbnb with her, Mr. Berg threatened to call the police. *Id.* at 102:25-104:13.

Ms. Wondra testified that in December 2024 or January 2025, she twice received phone calls from her children, crying and informing her that Mr. Berg had told them that he did not want them anymore and that they needed to go home to Oregon. *Id.* at 115:13-116:21. TSB independently corroborated this, stating that Mr. Berg once "got so angry and frustrated, that he told [TSB and MSB] that he didn't want [them] anymore and [they] had to fly back and live with [their] mother." *Id.* at 149:3-5. The next morning, Mr. Berg asked TSB if TSB had booked flights out of Mexico yet. *Id.* at 149:6-10.

This simmering discontent set the stage for March 2, 2025. On that day, Mr. Berg and TSB got into yet another conflict. TSB describes Mr. Berg entering the RV and going to his room but re-emerging a few minutes later with a demeanor that was dramatically and inexplicably more tense and aggressive. *Id.* at 154:21-155:5. Mr. Berg began chastising TSB about dirty dishes, which quickly escalated into a heated argument, with the two of them yelling at each other. *Id.* at 29:6-30:22, 155:6-17. This time, however, Mr. Berg got physical. With MSB standing five to six feet away, Mr. Berg tightly and aggressively grabbed TSB by the shoulders and tried to "haul" TSB toward the dishes that prompted the argument. *Id.* at 155:17-20; 157:21-158:4; 170:2-5. When TSB tried to push himself free of his father's grip, Mr. Berg "threw [TSB]

over a table into the couch." *Id.* at 170:4. The table was "set up with dishes drying on it" and there also were "a couple knives" sitting on the tabletop at the time. *Id.* at 157:20-25. TSB "ended up hitting that table and falling over it onto [the] couch and the dishes went everywhere." *Id.*

Both children described feeling substantial fear of their father based on this incident. *Id.* at 156:1-5; 175:5-8. For his part, Mr. Berg simply left the RV without addressing his outburst. *Id.* at 157:19-20. The children waited for Mr. Berg to go out on the water for the afternoon. They packed overnight bags, grabbed their passports, and went to Mr. Hartog's campsite, leaving behind their dog. *See id.* at 52:20-53:7, 54:17-20, 158:10-14. They stayed for most of the day. *Id.* at 52:25-53:1. When they stayed for dinner, which was not typical, Mr. Hartog asked the children what had happened. *Id.* at 53:2-7. The children told Mr. Hartog about the altercation with Mr. Berg, and Mr. Hartog called Ms. Wondra, who relayed that the children were crying and sounded shaken. *Id.* at 117:19-23. Mr. Hartog also testified that the children were shaking and seemed nervous and afraid. *Id.* at 54:3-21. Ms. Wondra booked a hotel room for the children for the night, expecting that the following day would be calmer. *Id.* at 82:12-83:7. Mr. Hartog drove the children to the hotel. *Id.* at 82:16-20. Ms. Wondra told Mr. Berg that the children were safe, but she did not tell him where they were staying, encouraging Mr. Berg to give the children some "space." *Id.* at 82:21-24. Mr. Berg responded that "[w]e've got a bunch of fathers out looking for them. We're knocking on all the doors. The police are here." *Id.* at 83:1-3.

The following morning, March 3, 2025, the children, still feeling unsafe, told Ms. Wondra that they did not want to go back to the campground and that they wanted to go home. *Id.* at 83:8-11. Ms. Wondra booked flights for both TSB and MSB from Cabo to Portland. Mr. Hartog drove them to the airport, telling them multiple times that they did not have to fly

back to the United States if they did not want to leave. *Id.* at 54:22-55:15. They insisted that they wanted to leave and proceeded to fly to Oregon. *Id.* at 55:10-11. Notably, TSB describes MSB's confidence in her decision to depart, stating that she did not hesitate to leave La Ventana. *Id.* at 159:1-2.

Upon returning to Oregon, MSB became even more integrated into life in Hood River. She reconnected with friends and began occasionally attending religious services with her mother. *Id.* at 76:22-23. MSB completed her first year with the Hood River Options Academy, where she is a straight-A student. *Id.* at 85:1-6. In September 2025, MSB got a part-time job working at a local café, where she still works. *Id.* at 85:13-20, 97:2-17.

**D.  Credibility Determinations**

"Where based in whole or in part on a witness's testimony, the Court's findings reflect credibility determinations based on its assessment of, *inter alia*, the relevant witness's demeanor, bias, and the extent to which the testimony was inherently logical and consistent with the testimony of other witnesses and relevant documentary evidence." *See Swett v. Bowe*, 733 F. Supp. 3d 225, 243 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024).

Mr. Berg's witness Ms. Pérez Briceño was credible, although her testimony was only minimally relevant. She testified as an expert in Mexican family law. Ms. Pérez Briceño is an attorney with more than 15 years of experience in Mexican family law, including child custody disputes. ECF 32 at 2-3. She differentiated between residents of Mexico and vacationers to Mexico, indicating that Mexican custody laws applied to the former but not the latter. Trial Tr. 39:5-14. She also informed the Court that individuals may become Mexican residents for the purposes of a child custody determination either by application to the Mexican Institute of Immigration or by establishing a domicile in Mexico for at least six months. *Id.* 40:21-41:16.

Ms. Wondra's witness Mr. Hartog was also generally credible. He provided relevant information. He testified as to the nature of the campground where both his family and the Berg/Wondra family stayed while in La Ventana and described getting to know MSB because of her close relationship with his daughter. *Id.* at 47:4-51:7. Additionally, he provided important context regarding the circumstances of MSB's alleged removal from Mexico to the United States. *Id.* at 51:8-55:15. Finally, he discussed MSB's maturity. *Id.* at 55:16-56:10.

The Court finds Ms. Wondra to be highly credible. Though she occasionally did not recall specific details that Mr. Berg believed to be relevant, such as a discussion between the two of them about "getting [the children] on a sleep schedule," *id.* at 98:17-19, her testimony was consistently corroborated by other evidence in the record. Moreover, her demeanor in the courtroom was calm and collected, even when Mr. Berg attempted to introduce irrelevant facts that might have been construed as damaging to her character. Finally, she acknowledged facts that did not portray her in a positive light, such as her admission that she hit Mr. Berg in February or March of 2024 after discovery of his alleged affair. *Id.* at 79:2-80:3.

The Court finds that Mr. Berg was less than fully credible. The Court bases this conclusion primarily on inconsistencies between Mr. Berg's testimony and other evidence, Mr. Berg's demeanor while testifying, and Mr. Berg's numerous misrepresentations of the law contained in his legal filings, including after the Court admonished Mr. Berg about these problems in his written submissions.[3]

---

[3] On November 25, 2025, Mr. Berg filed a Motion to Exclude Respondent's Article 13(2) "Mature Child" Objection, ECF 22, attempting to bar Ms. Wondra from arguing that MSB's objection to returning to Mexico should be given great weight because of her maturity. In his motion, Mr. Berg cited a British case, *In re Robinson*, [UK] EWCA Civ. 139, for the proposition that "children influenced by abducting parent cannot form independent objection." ECF 22 at 5. After an exhaustive search by the Court, it became clear that this case does not exist. Additionally, Mr. Berg cited cases that do exist but he cited them for propositions that they do

Regarding the inconsistencies between Mr. Berg's testimony and other record evidence, the Court focuses on the physical altercation between Mr. Berg and his son on March 2, 2025. Mr. Berg testified that the incident "was not a physical altercation." *Id.* at 12:20. He then described how his "hands came in contact with [TSB's] shoulders" during the argument, and how he "sat [TSB] on the couch." *Id.* at 29:4-8. After some additional questioning by the Court, Mr. Berg acknowledged that TSB did not want to sit on the couch and that Mr. Berg had "pretty much forced him to sit down." *Id.* at 29:9-23. That Mr. Berg had to be prodded to reveal key

---

not support. For example, he cited *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010), for the proposition that the mature child defense is a narrow exception to the convention, ECF 22 at 2, and *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001), for the proposition that "[c]ourts reject objections where the child's statements 'reflect the views of the abducting parent.'" ECF 22 at 3. *Cuellar* does not discuss the mature child defense at all, and *Blondin* does not include the quoted passage; nor does it support the underlying principle. It also was expressly abrogated by the Supreme Court. *See Golan v. Saada*, 596 U.S. 666, 682 (2022). In addition, Mr. Berg cited three cases for the proposition that the Ninth Circuit required respondents to meet a four-factor test to prove the mature child defense. ECF 22 at 2-3. One of those cases was vacated by the Supreme Court after *Golan*. *See Radu v. Shon*, 11 F.4th 1080, 1088 (9th Cir. 2021), *vacated*, 142 S. Ct. 2861 (2022). And two others were not from the Ninth Circuit. *See De Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007); *Blondin*, 238 F.3d at 155. Further, these two cases did not turn on the mature child defense. *See Radu*, 11 F. 4th at 1086 (discussing Article 13(b), grave risk); *Blondin*, 238 F.3d at 163 (same). None included Mr. Berg's self-described "four-factor test."

Mindful that Mr. Berg is representing himself, the Court by email informed him of the above mistakes and asked whether he had used artificial intelligence to prepare his motion. *See* Trial Tr. 135:24-136:7. Mr. Berg responded that he was unable to independently verify his citations, but that he understood his responsibilities under Rule 11 of the Federal Rules of Civil Procedure and would review his future filings to ensure compliance. *See id.* at 136:8-13.

Three days later, on November 29, Mr. Berg filed both his trial brief, ECF 30, and a rebuttal trial brief, ECF 31. In his trial brief, he cites *Monasky v. Taglieri*, 589 U.S. 68, 77 n.3 (2020), for the proposition that "domestic violence can distort or undermine voluntariness in parental intent." ECF 30 at 3. In his rebuttal trial brief, he again cites *Monasky* for the proposition that "domestic violence can distort or undermine voluntary parental intent." ECF 31 at 2. He later cites the same footnote in *Monasky* and represents that it states: "Domestic violence can shape and even distort parental intent." *Id.* at 3. Footnote three of *Monasky*, however, has nothing to do with parental intent, and that purported quote appears nowhere in the opinion. Rather, the footnote lists factors that courts consider in determining acclimatization. *See Monasky*, 589 U.S. at 78 n.3.

details of this incident invites suspicion as to whether he shared the full truth. That Mr. Berg's version of events differs so dramatically from the version provided by TSB and MSB during their judicial interviews also cast doubt on the credibility of Mr. Berg. The Court notes that these judicial interviews were conducted *in camera* without the benefit of cross examination, but it was Mr. Berg who wanted TSB to be interviewed by the Court *in camera* without formal direct or cross-examination by either side in open court. These inconsistencies reveal Mr. Berg as someone who may omit material details or mischaracterize important events, but not necessarily as someone who tells outright falsehoods. Thus, the Court still considers Mr. Berg's testimony, although the Court will give it less weight when faced with conflicting evidence.

## CONCLUSIONS OF LAW

### A. General Standards

The Convention was adopted in 1980 "[t]o address the problem of international child abductions during domestic disputes." *Monasky*, 589 U.S. at 71 (alteration in original) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014)). The United States has ratified the treaty and enacted implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011. ICARA authorizes federal district courts and state courts to hear Convention petitions. *Id.* § 9003(a). Courts must decide cases "in accordance with the Convention." *Id.* § 9003(d). Mexico also has ratified the treaty.[4]

"It is the Convention's core premise that the 'interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of

---

[4] Mexico acceded to the Convention, giving rise to an acceptance, on June 20, 1991, and the Convention entered into force on November 11, 1991. *See* Hague Conference on Private Int'l Law, Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last updated November 14, 2022).

'habitual residence.'" *Monasky*, 589 U.S. at 72 (alteration in original) (quoting Convention Preamble). Thus, "the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Id.* Therefore, "[w]hen a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott v. Abbott*, 560 U.S. 1, 9 (2010) (quoting Convention, art. 12). One such exception is set forth in an unnumbered paragraph of Article 13—an exception alternatively referred to as the "age and maturity defense" or the "wishes of the child" exception.

To establish a prima facie case under the Convention, the petitioner must prove by a preponderance of the evidence that: (1) the child was "habitually resident" in a foreign country that is a signatory to the Convention; (2) the removal of the child breached the petitioner's custody rights under the foreign country's law; and (3) the petitioner was exercising custodial rights at the time of the removal. 22 U.S.C. § 9003; Convention, arts. 3, 4.

## B.  Habitual Residence

The Convention does not define "habitual residence," and courts have applied the standard that "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 589 U.S. at 77. "[A] child's habitual residence depends on the totality of the circumstances specific to the case" and is a "fact-driven inquiry." *Id.* at 71, 78. In general, a child's habitual residence is "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291-92 (3d Cir. 2006) (citation omitted).

In determining habitual residence, "[n]o single fact, however, is dispositive across all cases." *Monasky*, 589 U.S. at 78. Facts that courts have considered for determining habitual

residence or acclimatization include:[5] length of stay, social engagements and excursions, meaningful connections with the community, language proficiency, academic activities, parental employment, location of personal belongings, participation in religious activities, location of the child's medical care, previous limited stays in other countries, and parental intent[6]. Immigration status of caregiving parents also is a relevant consideration. *Monasky*, 589 U.S. at 78 n.3; *see also Nisbet II*, 124 F.4th at 586. Importantly, though, habitual residence is distinguished from domicile or citizenship. *See Kijowska v. Haines*, 463 F.3d 583, 587-88 (7th Cir. 2006).[7] Habitual residence requires a fact-based inquiry that focuses on the child's experiences, not the parent's intentions or legal status. *See Friedrich v. Friedrich*, 983 F.2d 1396, 1401-02 (6th Cir. 1993).

---

[5] *Watts v. Watts*, 935 F.3d 1138, 1144-45 (10th Cir. 2019) (length of stay); *Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004) (social engagements); *Nisbet v. Bridger* (*Nisbet II*), 124 F.4th 577, 585-86 (9th Cir. 2024) (community); *McClary v. McClary*, 2007 WL 3023563, at *7 (M.D. Tenn. Oct. 12, 2007) (language proficiency); *Karkkainen*, 445 F.3d at 293-94 (academic activities); *Roche v. Hartz*, 783 F. Supp. 2d 995, 1001-02 (N.D. Ohio 2011) (same); *De La Vera v. Holguin*, 2014 WL 4979854, at *11 (D.N.J. Oct. 3, 2014) (parental employment); *Harsacky v. Harsacky*, 930 S.W.2d 410, 414-15 (Ky. Ct. App. 1996) (parental employment, location of personal belongings); *Babcock v. Babcock*, 503 F. Supp. 3d 862, 876-77 (S.D. Iowa 2020) (location of personal belongings); *Martine v. Cahue*, 826 F.3d 983, 992 (7th Cir. 2016) (participation in religious activities); *Cartes v. Phillips*, 240 F. Supp. 3d 669, 680 (S.D. Tex. 2017) (participation in religious activities; location of the child's medical care); *Olga Sugey Centeno Aguirre v. Hernandez*, 757 F. Supp. 3d 1211, 1225 (D. Colo. 2024) (location of the child's medical care); *Foster v. Foster*, 429 F. Supp. 3d 589, 608 (W.D. Wis. 2019) (previous limited stays in other countries); *Douglas v. Douglas*, 2021 WL 4286555, at *5 (6th Cir. Sep. 21, 2021) (parental intent); *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005) (parental intent).

[6] In *Monasky*, the Supreme Court rejected the previous Ninth Circuit rule in *Mozes v. Mozes*, 239 F.3d 1067, 1084 (9th Cir. 2001), that determined habitual residence by looking to the shared intent of the parents. Parental intent, however, remains a factor that courts can consider, when appropriate, as part of the totality of the circumstances. *Monasky*, 589 U.S. at 78.

[7] For a more thorough discussion on the differences between habitual residence under the Convention and domicile, nationality, and citizenship, *see generally* Elisa Pérez-Vera, Explanatory Report, in 3 Actes et Documents de la Quatorzième session, 426-76 (1982), https://www.fjc.gov/sites/default/files/2016/Explanatory%20Report%20by%20Elisa%20Pe%CC%81rezVera%20Report_0.pdf.

### 1.  MSB's connections to Mexico and the United States

The Court finds, under the totality of the circumstances, that MSB's habitual residence is the United States, not Mexico. Indeed, *all* factors listed in the previous section support a finding that MSB's habitual residence is the United States, including the location of her medical care, belongings, job, and religious services, the language she speaks,[8] and her family's citizenship. MSB has always attended a virtual school based in the United States. Because these factors originated well before the family's first trip to La Ventana, it is unsurprising that MSB herself considers the United States to be home and has never thought of Mexico as anything other than a vacation spot. Though her online school allowed her to attend class in Mexico, MSB can now attend exams in person and participate in extracurricular activities like joining classmates for a school trip. MSB has close friends in Hood River. Although this friend group draws primarily from the migratory water sports community, including some who winter in La Ventana, it is clear that those friends would call Hood River, and not La Ventana, home.

Most importantly, MSB's brother is in Hood River. Because he is 17, TSB is not subject to the Convention and so will remain in the United States. Mr. Berg, Ms. Wondra, TSB, and MSB all characterized the relationship between MSB and TSB as close. The bond between TSB and MSB appears to transcend even what is typical in a sibling relationship. This makes sense. For virtually their entire lives, they have not only been raised together but schooled together. For much of the last six years, due to the family's frequent travels, they have been each other's primary or even sole social companion. In the Court's interviews with each child, their love for

---

[8] Petitioner notes that Spanish is not required to navigate life at the campground in La Ventana, which both MSB and her brother confirmed. But the Court notes with concern that, in an emergency, MSB would be limited in her ability to communicate with the local community in Mexico. Those limitations do not exist in Oregon.

each other was obvious, and the importance of the sibling relationship to each of them was undeniable. The Convention does not contemplate how courts are to account for such relationships when a parent has petitioned for the return of one child but not the other. Overwhelmingly, absent good reason to the contrary, courts have declined to separate siblings.[9] The Court thus gives special weight to the close relationship that MSB and TSB enjoy. In an ocean of other factors supporting the conclusion that MSB is habitually resident in the United States, this is the final wave that swamps Mr. Berg's contention that MSB's habitual residence is Mexico. The Court will not separate MSB from TSB. To do so would be cruel to both children.

## 2. Parental Intent

Parental intent is one factor in determining a child's habitual residence. *See Monasky*, 589 U.S. at 78. By Mr. Berg's telling, his family began splitting time between the United States and Mexico in 2021, spending summers in the U.S. and winters in La Ventana. As a result, Mr. Berg represented that both jurisdictions were family residences. When he and Ms. Wondra separated, he argues, they mutually intended that the children continue splitting time between the United States and Mexico.[10] Ms. Wondra would take up permanent residence in Hood River,

---

[9] *See, e.g.*, *Leonard v. Lentz*, 297 F. Supp. 3d 874, 896-98 (N.D. Iowa 2017) ("To return only two siblings would be detrimental to all three."); *McManus v. McManus*, 354 F. Supp. 2d 62, 70-72 (D. Mass. 2005) (refusing to return some, but not all, siblings); *Ermini v. Vittori*, 758 F.3d 153, 167 (2d Cir. 2014) ("[I]n light of the children's close relationship to each other, . . . we determine as well that it was not error for the district court to decline to separate the children.").

[10] Under the Convention, "[a] person can have only one habitual residence." *Friedrich*, 983 F.2d at 1401; *see also Mozes*, 239 F.3d at 1075 n.17; *Didon v. Castillo*, 838 F.3d 313, 321-22 (3d Cir. 2016). Courts have contemplated the possibility that, when a child regularly moves between parents in two different countries and spends roughly equal time with both parents, the child may have alternating habitual residences. *See Johnson v. Johnson*, 493 S.E.2d 668, 669 (Va. Ct. App. 1997); *Brooke v. Willis*, 907 F. Supp. 57, 58-59, 61 n.2 (S.D.N.Y. 1995). In cases of alternating habitual residences, courts have more consistently looked to parental intent as an important but not dispositive guide. *See Valenzuela v. Michel*, 736 F.3d 1173, 1179 (9th Cir. 2013) (citing *Wilson v. Huntley*, 2005 CarswellOnt 1606 (WL) (Can. O.N.S.C.); *Watson v. Jamieson*, [1998] S.L.T. 180, 182 (Scot.)). Although Mr. Berg and

while Mr. Berg would take up residence in La Ventana. Ms. Wondra vehemently denies this characterization, arguing that the family's yearly trips to La Ventana were an extended vacation, and thus that MSB's continued visits to see Mr. Berg were vacations as well.

The evidence supports Ms. Wondra's view. Both TSB and MSB shared their perception that the annual trip to La Ventana, despite being more regular and more extended than many of their other world travels, was a vacation intended to take advantage of the area's ideal conditions for winging and kite surfing. Additionally, despite multiple winter visits to the area, the family always stayed in a van or recreational vehicle at a campground with no on-site running water hookups and few if any permanent structures, suggesting that the family never intended to make it their home.[11] Indeed, both Mr. Berg and Ms. Wondra described the campground as an intolerable place to live for substantial portions of the year. Conversely, throughout the family's world travels, including their yearly visits to La Ventana, Ms. Wondra continued to own a house in La Crosse, Wisconsin, that she described as the family's "home base." Trial Tr. at 71:2-7. This was the home in which MSB and TSB were raised and where they returned after every trip.

Notably, in multiple declarations, bank documents, and vehicle bills of sale (some signed in Mexico, and some even post-dating MSB's return to the United States), Mr. Berg has consistently represented himself as a resident of the United States. Further, Mr. Berg's arguments

---

Ms. Wondra's parenting arrangement could be characterized as creating an alternating habitual residence, neither party makes that argument.

[11] The Ninth Circuit has specifically rejected the argument that a lack of running water constitutes a grave risk of harm to a child justifying an otherwise unlawful removal, reasoning that such a determination would give "parents in more developed countries . . . . unchecked power to abduct children from countries with a lower standard of living." *Cuellar*, 596 F.3d at 509. Here, though, the temporary quality of MSB's accommodations do not go to an analysis of grave risk but rather are probative of her parents' intent to make La Ventana the family's home. This is because Mr. Berg and Ms. Wondra had the means to establish the family more permanently in La Ventana but chose temporary accommodations instead.

in support of MSB's habitual residence being Mexico undermine his position. Despite several years of visits to Mexico, the family never applied for residency and never stayed for six months, as his expert witness explained was required to attain legal Mexican residency.[12] Additionally, when cross-examining Ms. Wondra, Mr. Berg asked her whether the two of them had ever toured a house in La Ventana, presumably with the aim of purchasing it. Ms. Wondra acknowledged that they had. But rather than buttressing the proposition that the family was deeply embedded in La Ventana, this fact does the opposite. That they never ultimately purchased a home despite opportunity to do so shows that the family actively considered a more permanent presence in the city but decided against it. In sum, these facts show that MSB's parents never intended their annual trips to La Ventana to be anything more than an extended vacation.[13] They also show that, on March 3, 2025, when MSB flew to the United States, Mexico was not her habitual residence.

## C. Age and Maturity Defense

Ms. Wondra also affirmatively raises the age and maturity defense. Courts "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."

---

[12] As discussed above, the habitual residence analysis is not a question of domicile. The Berg/Wondra family's repeated failure to acquire legal Mexican residency, however, is probative of whether they had a settled intent to be at home there.

[13] Because it contemplates an equal and routine split in time between Hood River and La Ventana, the parental agreement could be interpreted to suggest a change in parental intent as to MSB's habitual residence. That interpretation would be incorrect for two reasons: first, the agreement was unaccompanied by any shift in the other indicia of habitual residence from Hood River to La Ventana. Second, the agreement contains a provision that gives one parent full custody if the other engages in excessive drinking or physical or emotional abuse. While the Court does not make a finding as to whether the events in La Ventana amounted to abuse, it is clear that the facts reasonably could lead Ms. Wondra to believe that abuse occurred. Thus, the Court finds that the parental agreement did not represent Ms. Wondra's intent as to MSB's habitual residence at the time MSB departed La Ventana.

Convention, art. 13. Ms. Wondra has the burden to establish, by a preponderance of the evidence, that this exception applies. *Rodriguez v. Yanez*, 817 F.3d 466, 473-74 (5th Cir. 2016). The standard for evaluating a child's objections under the Convention is more restrictive than the standard for evaluating a child's wishes in a custody case. *See Kovačić v. Harris*, 328 F. Supp. 3d 508, 523 (D. Md. 2018) (citing *Hirst v. Tiberghian*, 947 F. Supp. 2d 578, 597 (D.S.C. 2013)). Thus, the age and maturity defense is an exception to be applied narrowly. *See Swett*, 733 F. Supp. 3d at 264. However, "[r]equiring the district court to distinguish between a child's custody-based and non-custody-based objections would likely be an impossible task—a task that the Convention does not require." *Custodio v. Samillan*, 842 F.3d 1084, 1091 (8th Cir. 2016).

### 1. MSB's Objections

The Ninth Circuit has not provided definitive standards on how to evaluate whether a child has objected to return. Other Circuits have differentiated between a child's generalized preference for remaining in the United States and their particularized objection to returning to another country.[14] These objections may be inferred even if the child does not state them directly. *See Tann*, 648 Fed App'x at 149 & n.3 (affirming a district court's finding that a child objected to return to Northern Ireland where the child lodged "particularized complaints" about Ireland, such as that he did not feel safe there and might hurt himself or others if he went back).

---

[14] *See Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007) (district court declined to apply exception when child expressed only "generalized desire to remain in" United States); *see also Avendano v. Balza*, 985 F.3d 8, 13-14 (1st Cir. 2021) (considering child's preference where child preferred to stay in one United States and objected to returning to Venezuela); *Tann v. Bennett*, 648 Fed. App'x 146, 149 n.3 (2d Cir. 2016) (same). *But see de Silva v. Pitts*, 481 F.3d 1279 (10th Cir. 2007) (declining to return a child because he gave reasons for wanting to remain in the United States, despite giving no objections to going back to Canada).

Although some courts have held that the objection must be based on something more than a child's preference for one parent over the other, the Fifth Circuit convincingly has ruled that:

> For most wrongfully removed children, the choice between countries is effectively a choice between parents. If the court honors the child's objection to returning, she will almost certainly live with the abducting parent—at least until the custody dispute is resolved. As a result, whether the child *wants* to live with the abducting parent is very relevant to her interpretation of her immediate "interests." Indeed, it is likely the most important consideration. We fear that a rule formally prohibiting objections based upon this consideration would result in hearings full of winks and nods. Rather than express the real reason for her objection, a wrongfully removed child would be coached to testify that she has strong preferences about where she goes to school, but no preference about who she lives with or who takes care of her.

*Rodriguez*, 817 F.3d at 476. The Court finds this to be the most reasonable application of the Convention and will consider MSB's mature objections.

During her in-camera interview, MSB voiced a particularized objection to returning to Mexico, as well as similarly specific reasons for her preference to stay in the United States. She directly stated that she did not feel safe in La Ventana as long as her father was there. Trial Tr. 179:12-13. She anticipated that she would have concerns about her safety in Mexico *even if she was accompanied by her mother*. *Id.* at 175:5-8. She a preference for living with her mother and her brother in Hood River full time. *Id.* at 174:22-175:16. In her interview, her body language and tone of voice shifted in a noticeably positive direction when discussing life in Hood River, including especially the academic and extracurricular opportunities.

This trial is not the first time that MSB has evinced such an objection. TSB described her adamant decision to leave the campground in Mexico. *Id.* at 159:1-2. When Mr. Hartog repeatedly gave MSB the option to return to La Ventana, she repeatedly chose to continue on to Hood River. *Id.* at 54:22-55:11. In short, the Court finds that MSB has particularized objections to returning to Mexico *and* a generalized preference for remaining in the United States.

### 2.  MSB's Maturity

Determining the maturity of a child under the Convention is a fact-intensive inquiry. There is no age at which children are automatically considered mature under the Convention. However, "it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against [his or her] will." Pérez-Vera Report at 433 ¶ 30. Thus, courts have generally, though not universally, given great weight to the objections of children who are currently or who are about to turn fifteen. *See, e.g.*, *Kovačić*, 328 F. Supp. 3d at 516; *Gaudin v. Remis*, 2007 WL 9711034, at *2-5 (D. Haw. June 1, 2007), *aff'd* 334 Fed. App'x 133 (9th Cir. 2009); *Etienne v. Zuniga*, 2010 WL 2262341, at *7-8 (W.D. Wash. June 2, 2010).

MSB turned fifteen on November 21, 2025. In her interview with the Court, she displayed a clear and sophisticated understanding of the purposes of these proceedings. She discussed the issues with a level-headedness more characteristic of someone several years her senior. She is articulate, expressive, and intelligent, able to recognize the upsides and downsides both Hood River and La Ventana, indicating that her objections are "born of rational comparison" between her life in the United States and her life in Mexico. *See Hirst*, 947 F. Supp. 2d at 597 (quoting *Castillo v. Castillo*, 597 F. Supp. 2d 432, 441 (D. Del. 2009)). For example, she lamented being unable to reunite with friends in La Ventana, but was able to situate that disappointment within the broader context of her perception of her own interests.

Other evidence in the record supports the conclusion that MSB is mature, including the responsibility and initiative she displays in school, at work, and in household chores. She has travelled all over the world and safely navigated the journey home from La Ventana largely without adult supervision. Every trial witness who knows MSB personally described her as mature. TSB and MSB agreed that, despite being the younger sibling, she often has to "straighten him out" when he or his friends have made immature decisions. *Id.* at 161:1-8; 173:23-174:7.

Even Mr. Berg acknowledged that MSB was an "amazing mature person." *Id.* at 133:3. His counterargument appears to be that she is not quite mature *enough*. This counterargument rests on three contentions: first, that the Convention requires "an overwhelming sense that the child is self-sufficient" with a "high emotional quotient" in order for a court to find the child to be mature. *Id.* at 132:20-133:11. This is simply not the case. There is no requirement that a child be totally self-sufficient in order to support a finding of maturity. Second, that MSB is not responsible enough to take care of herself, in part because of a penchant for candy and a habit of staying up late. *Id.* at 98:8-99:5; 133:3-10. This assertion is belied by the rest of the record. Even were these assertions true, neither the occasional late night nor a simple sweet tooth can overcome the mountain of evidence suggesting that MSB has a mature and grounded understanding of her circumstances. Finally, that MSB "has very pent-up emotional issues." *Id.* at 132:21. The Court saw no evidence of any emotional disturbance in MSB, either at trial or in camera. Given the facts of this case, it would be unsurprising if MSB had need of counseling or therapy. Children often do after their parents split up. But that would no more be a reason to doubt her maturity than if she needed a cast for a broken leg.[15]

### 3.  Undue Influence

"A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." 51 Fed. Reg. at 10,510; *see also Tsai-Yi Yang*, 289 F.3d at 279 ("[A] court should also

---

[15] The Court finds Mr. Berg's argument about MBS's emotional health problematic for an additional reason. Were the Court to accept such an argument, it would crack the door for abusive parents in future cases to undermine an otherwise mature child's objection to return simply because that child suffered emotional fall-out from the parent's abuse. Though the grave risk defense, which is not at issue in this case, would presumably provide another mechanism to bar return in such circumstances, the Convention cannot be read in such a nonsensical way.

consider whether a child's desire to remain or return to a place is the product of undue influence, in which case the child's wishes should not be considered." (quotations omitted)). "Such influence need not be intentional or sinister; it may simply result from the child's retention by one parent." *Aguilera v. De Lara*, 2014 WL 3427548, at *7 (D. Ariz. July 15, 2014). Courts have recognized that a child's preferences can be influenced by the parent with whom they are living. *Soonhee Kim v. Ferdinand*, 287 F. Supp. 3d 607, 626 (E.D. La. 2018).

There is no evidence to support the claim that Ms. Wondra has unduly influenced MSB's objections, as Mr. Berg claims. MSB told the Court that no one had instructed her on what to say or not say during her interview. Her brother similarly stated that he had talked to no one about what he should say during his interview. MSB indicated that she was comfortable during the interview and gave no indication that she was worried about angering or disappointing either parent. Ms. Wondra testified under oath that her only instruction to MSB was for MSB to tell the truth. The Court also finds unconvincing the notion that MSB's time living with Ms. Wondra since March 2025 unduly influenced her wishes to avoid return to Mexico. MSB's decision to leave La Ventana predated this period and arose despite Ms. Wondra's initial assumption that the children would ultimately choose to stay in Mexico after Mr. Berg's altercation with TSB, despite Mr. Hartog's repeated offers to take the children back to the campground when he was transporting them to the airport, and despite TSB's insistence that he would have stayed with MSB in La Ventana had she displayed "any hesitation whatsoever" about leaving. Thus, the Court finds that MSB has attained an age and maturity sufficient for the Court to take account of her views and additionally finds that her views are untainted by undue influence.

Mr. Berg argues that "this is a pretty obvious case." Trial Tr. at 125:2-4. The Court agrees, although not in the way that Mr. Berg meant. The evidence is overwhelming and the law

is clear. MSB's habitual residence is the United States. Alternatively, MSB is 15 years old and demonstrates significant maturity and insight. The Court gives her objections and preferences great weight.

**CONCLUSION**

For the reasons stated herein, the Court DENIES Mr. Berg's Petition for Return, ECF 1.

**IT IS SO ORDERED**.

DATED this 12th day of December, 2025.

_____
Michael H. Simon
United States District Judge